OPINION
{¶ 1} These consolidated appeals of Carrie Gomer O'Neil ("Carrie") and Carl Call ("Carl") are from the September 19, 2003 judgment entry of the Common Pleas Court of Wyandot County, Juvenile Division, terminating Carrie's parental rights with respect to Tamora Gomer ("Tamora") and Kristel Gomer ("Kristel") and terminating Carl's parental rights with respect to Tamora and granting the motion of the Wyandot County Department of Job and Family Services ("Department") for permanent custody of Tamora and Kristel.
 {¶ 2} On June 14, 2001, social workers from the Department went to the home of Robert Pennington and Michelle Caudill, the babysitters for Tamora and Kristel, to investigate a reported severe beating discovered on Kristel's bottom and back. It was investigated and confirmed by the Department that on June 13, 2001, Richard O'Neil had hit Kristel with a belt on her bottom which left marks and bruising. Tamora and Kristel also were dirty, had head lice, rotten teeth and "grown-out" nails. Both Tamora and Kristel were very shy, showing signs of social development problems, and had speech defects to the extent it appeared they had created their own language. The children also did not know their colors, the alphabet, or the names of simple objects. Tamora and Kristel were placed in a foster home until it could be assessed that it was safe for them to return to their home.
 {¶ 3} Temporary custody of Tamora and Kristel was awarded to the Department on June 18, 2001 by telephone ex parte order, which was journalized in the trial court's June 19, 2001 judgment entry, for the reason that probable cause existed to believe that Kristel was an abused and dependent child and that Tamora was a dependent child. The matter was heard for purposes of adjudication on July 26, 2001, in the Common Pleas Court of Wyandot County, Juvenile Division. The address of Carl, the biological father of Tamora, was unknown at the time of the adjudication and he was served prior to the hearing by publication. Carl failed to answer or otherwise enter an appearance in the case at this point. The address of Robert Evans, the biological father of Kristel, was also unknown at the time of the adjudication and he was served by publication prior to the adjudication hearing. Carrie appeared at the hearing and, through her attorney, entered an admission to the allegations in the complaint for both Tamora and Kristel. Tamora was adjudicated a dependent child in Case No. 2012019, and Kristel was adjudicated an abused and dependent child in Case No. 2012020, such being journalized in the trial court's September 6, 2001 judgment entry. The cause was continued and temporary custody of Tamora and Kristel remained with Department.
 {¶ 4} The Department then filed a motion for permanent custody of Tamora and Kristel on May 23, 2002. A copy of the motion for permanent custody, notice of rights, notice of initial hearing and notice of adjudication hearing was issued to the Sheriff of Steuben County, Indiana, for service upon Carl. On June 10, 2002, a return of service from the Sheriff of Steuben County was filed on Carl.
 {¶ 5} On May 30, 2002, Richard O'Neil was sentenced to six months in prison for domestic violence of Kristel Gomer. The matter then came before the court for a review hearing on June 17, 2002, in which both Carl and Carrie appeared. Carl was appointed counsel at this time and the July 16, 2002 judgment entry reflects that a "conditional denial" to the motion for permanent custody was entered by the court on Carl's behalf. The court further found that, despite reasonable efforts by the Department, the reunification goals outlined in the case plan had not been satisfactorily met and temporary custody of Tamora and Kristel was continued, pending hearing on the motion for permanent custody.
 {¶ 6} Carl filed a motion to dismiss the motion for permanent custody on August 26, 2002, on the grounds that the motion for permanent custody was filed contrary to R.C. 2151.413(D)(3)(b). In addition, Carl filed a motion to vacate the June 19, 2001 ex parte order and the September 6, 2001 judgment entry and a motion for stay of proceedings.
 {¶ 7} A hearing on the matter was held on September 9, 2002. By agreement of the parties, the motion for permanent custody filed by the Department, as well as the motion to dismiss the motion for permanent custody and the motion to vacate filed by Carl, were then withdrawn. On the same day, the court extended the temporary custody of Tamora and Kristel with the Department for six months, calculated from June 15, 2002. The trial court also communicated with the Steuben County Circuit Court in Angola, Indiana, which relinquished its jurisdiction in the matter. Further, it was agreed at the September 9, 2002 hearing that Carl would be granted supervised visitation with Tamora, for one to one and a half hours, once every other week, and Carl was added to the case plan. The proceedings were summarized in the trial court's September 24, 2002 judgment entry.
 {¶ 8} On December 9, 2002, the matter again came for review before the trial court. The court determined that it was in the best interest of Tamora and Kristel for temporary custody by the Department to be extended for a period of six months, "pending the filing of further motions, possibly a Motion for Permanent Custody." January 31, 2003 Judgment Entry, p. 1. Further, by agreement of the parties, Carl was granted "up to two additional supervised visits per month at Harmony House, for up to three (3) hours each, on the weekends, to be arranged with Harmony House and paid for by Mr. Call." January 31, 2002 Judgment Entry, p. 2.
 {¶ 9} On May 2, 2003, the Department filed a second motion for permanent custody of Tamora and Kristel. The initial hearing on the motion was held on June 2, 2003. The adjudicatory hearing on the motion for permanent custody was scheduled for June 13, 2003, which was continued by motions of the parties until August 19, 2003. The hearing consisted of two days of testimony. The trial court issued its judgment entry on September 19, 2003 terminating the parental rights of Carrie and Carl with respect to Tamora and Kristel, on the grounds that they could not be placed with one of their parents with a reasonable time and granting permanent custody of the children to the Department, on the ground that it was in the best interest of the children. Carrie and Carl now appeal the September 19, 2003 judgment entry.
 {¶ 10} We begin our review of the issues in this case by noting "[i]t is well recognized that the right to raise a child is an `essential' and `basic civil right.'" In re Hayes (1997),79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing In re Murray
(1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. Thus, "a parent's right to the custody of his or her child has been deemed `paramount'" when the parent is a suitable person. In re Hayes,
supra (citations omitted); In re Murray, supra. Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a `substantial right[.]'"In re Murray, supra. Based upon these principles, the Ohio Supreme Court has determined that a parent "must be afforded every procedural and substantive protection the law allows." Inre Hayes, supra (citation omitted). Thus, it is within these constructs that we review the assignments of error presented to this court.
 {¶ 11} The following review of the standard the trial court must utilize in granting permanent custody to a state agency is relevant to both parties' assignments of error. The Revised Code requires that the trial court determine, by clear and convincing evidence, that a grant of permanent custody to the agency that has so moved is in the best interest of the child and that one of four enumerated factors applies. R.C. 2151.414(B)(1). Included in this list is that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period[.]" R.C. 2151.414(B)(1)(d).
 {¶ 12} Clear and convincing evidence has been described by the Supreme Court of Ohio as:
[T]hat measure or degree of proof which will produce in themind of the trier of facts a firm belief or conviction as to theallegations sought to be established. It is intermediate, beingmore than a mere preponderance, but not to the extent of suchcertainty as is required beyond a reasonable doubt as in criminalcases. It does not mean clear and unequivocal.
 Cross v. Ledford (1954), 161 Ohio St. 469, 477,120 N.E.2d 118, citing Merrick v. Ditzler (1915), 91 Ohio St. 256,110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross, 161 Ohio St. at 477. Thus, we are required in this case to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof. A judgment of the trial court that is supported by clear and convincing evidence will not be disturbed. SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273.
 {¶ 13} The record in this case reflects that Tamora and Kristel were placed into the temporary custody of the Department on June 18, 2001. At the time the Department filed for permanent custody on May 2, 2003, Tamora and Kristel had continuously been in the custody of the Department for almost two years. These facts were not disputed during the permanent custody hearing nor are they disputed on appeal to this court. However, the trial court was then required by statute to subtract a period of sixty days from this time in making its determination as to whether Tamora and Kristel were in the continuous custody of the Department for a twelve-month period. See R.C. 2151.414(B)(1). Our examination of the record reveals that the trial court properly followed this statutory section and found by clear and convincing evidence that the children had been in the temporary custody of the Department for twelve or more months of a consecutive twenty-two month period in accordance with R.C.2151.414(B)(1)(d).
 {¶ 14} However, our evaluation does not end upon the determination that the children had been in the custody of the Department for twelve months of a consecutive twenty-two month period. Rather, the trial court must also make the determination as to whether permanent custody is in the best interest of the children by considering all relevant factors, including, but not limited to the five factors listed in R.C. 2151.414(D):
(1) The interaction and interrelationship of the child withthe child's parents, siblings, relatives, foster care-givers andout-of-home providers, and any other person who may significantlyaffect the child;
 (2)The wishes of the child, as expressed directly by the childor through the child's guardian ad litem, with due regard for thematurity of the child;
 (3)The custodial history of the child, including whether thechild has been in the temporary custody of one or more publicchildren services agencies or private child placing agencies fortwelve or more months of a consecutive twenty-two month period * * *
 (4) The child's need for a legally secure permanent placementand whether that type of placement can be achieved without agrant of permanent custody to the agency;
 (5) Whether any of the factors in division (E)(7) to (11) ofthis section apply in relation to the parents and child.
"In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence." R.C. 2151.414(E).
 {¶ 15} We now turn to the assignments of error raised in this case. Carrie appeals the trial court's judgment terminating her parental rights of Tamora and Kristel Gomer and granting permanent custody of Tamora and Kristel to the Department. Carrie asserts the following assignment of error.
The trial court committed reversible error in finding thatappellee provided clear and convincing evidence pursuant to OhioRevised Code Section 2151.414 that the minor children cannot beplaced with one of their parents within a reasonable period oftime and that a permanent commitment is in the best interest ofthe children.
 {¶ 16} In her sole assignment of error, Carrie argues that the Department did not provide sufficient evidence under the clear and convincing standard for the trial court to find that her parental rights should be terminated. We have already established that the trial court's determination that Tamora and Kristel were in the custody of the Department for twelve months of a consecutive twenty-two month period was supported by clear and convincing evidence. We now review the record to determine whether the trial court's determination was also in the best interests of Tamora and Kristel.
 {¶ 17} Carrie asserts that the trial court discounted the fact that she had substantially completed the goals established by the Department and focused instead on whether it was safe for the children to be returned to Carrie and whether the causes which necessitated placement were alleviated. Carrie contends that the abuse suffered by Kristel was a one-time event that affected only one of the children. However, the evidence shows that the abuse Kristel endured was severe and that the incident was not the only time in which violence was present in the home in which the children lived.
 {¶ 18} Several factors make the situation regarding the abuse more serious than Carrie contends. First, when the bruises on Kristel were initially discovered, Carrie downplayed the seriousness of the beating and the bruises. Carrie even lied to the Department in an attempt to conceal Richard's role in the abuse. Carrie also offered explanations for the bruising that were not consistent with the marks on Kristel, such as Kristel aggravating the bruising by using the slide after she had been hit with a belt. Second, Carrie proceeded to marry Richard, the abuser of Kristel, while her children were still in the temporary custody of the Department and while a domestic violence charge was pending against Richard. Third, it was revealed during the Department's involvement in this case that Richard and Carrie did not have a stable relationship, had fought in front of the children, and Carrie had even filed a domestic violence charge against Richard on January 20, 2001.
 {¶ 19} The psychological assessment of Carrie dated July 15, 2003 indicates that Carrie sought to blame everyone but herself for her children being in the custody of the Department. Carrie responded to the evaluator's questions of what had changed and what she had learned since her children were taken into custody by the Department by stating that she had completed all the requirements placed on her by the Department and she was doing what she was supposed to be doing. As the evaluator probed further into Carrie's notion of herself being a responsible parent, Carrie became hysterical and angry at the evaluator and refused to answer any further questions. Carrie's lack of accepting responsibility for her failure to protect her children and her refusal to cooperate with the examiner at such a crucial time in the process, only several weeks from the date of the hearing on the motion for permanent custody, shows Carrie's continued weaknesses.
 {¶ 20} While the trial court found that Carrie had "complied with a significant amount of her case plan goals[,]" the trial court also found that "[t]he larger issue is whether it is safe for the children to be returned to her care and [whether] the causes which necessitated the placement [have] been alleviated[.]" September 19, 2003 Judgment Entry, p. 8. See Inre Hogan, 3d Dist. No. 1-01-141, 2002-Ohio-1770, 2000 WL 596111. In addition, one of Carrie's goals of the case plan was not only to attend anger management classes and therapy for stress management and coping skills, but also to demonstrate her improved stress management, coping and anger management skills. Carrie exhibited a lack of these skills throughout the period she was to work towards the goals of the case plan, even as recent as a few weeks before the hearing for permanent custody during her psychological assessment.
 {¶ 21} Carrie also failed to demonstrate her coping skills throughout the period the Department had temporary custody of Tamora and Kristel by her lack of consistent employment and lack of security in maintaining a place to live and payment of her bills. Carrie testified to losing her employment after Richard was incarcerated and being unable to pay the bills. Carrie testified that she was able to make the bills current by having her mother-in-law help her with the bills and by getting a job at Wendy's. Carrie subsequently lost her job at Wendy's, started working at Black Hawk, lost her job at Black Hawk, and was unemployed at the time of the hearing on the motion for permanent custody. This instability was a concern of the trial court in determining the best interest of Tamora and Kristel. The trial court found that Carrie's financial insecurity would make her dependent upon Richard, the man who was responsible for domestic violence against Kristel.
 {¶ 22} In addition to Carrie's current display of instability, the trial court noted that Carrie's history displayed a pattern of instability in both her relationships and care of her children. Carrie had three children by three different men, and Carrie admitted to having short relationships with these men before becoming pregnant. Carrie claims that she lost contact with one of her children, Michaela, after Carrie and Michaela's natural father agreed on a shared parenting arrangement. Carrie testified that Michaela's natural father just took off with her and she did not know where they were. The trial court pointed out that Carrie did not detail any efforts to locate Michaela.
 {¶ 23} The trial court placed great importance on the fact that it did not appear that Carrie had alleviated the causes of Tamora and Kristel being placed in the custody of the Department. Tamora and Kristel were taken from Carrie's custody after Richard, then Carrie's boyfriend, left bruises and marks on Kristel's body after a beating. Carrie continued to minimize the abuse of Richard even through the hearing on the motion for permanent custody. Carrie showed her lack of understanding of the gravity of the situation or her lack of care by marrying Richard during the process of trying to gain back custody of her children and in the midst of Richard's criminal proceedings. Carrie testified at trial that she stayed with Richard after learning of the abuse he inflicted on Kristel because she was purportedly told by others to stay with Richard and to stay in Ohio. Carrie testified that she was unable to leave Richard because she didn't have any money to get her own place. Ironically, Carrie testified that she had planned to leave Richard a couple of weeks prior to the abuse of Kristel because she and Richard had a big argument, but instead of carrying through with her plans to leave Richard after the abuse of Kristel, Carrie instead married him. Carrie testified that she and Richard then started counseling, in accordance with the case plan, so they could work things out in their relationship.
 {¶ 24} It is of importance to note that not one of the professionals involved with Carrie and Richard as a part of the case plan opined that custody of Tamora and Kristel should be given to Carrie at the time of the hearing on the motion for permanent custody. While Carrie and Richard participated in education programs to improve their parenting skills, counseling to improve communication skills, conflict resolution skills, parenting skills, and personal stability and emotional issues, as well as anger management classes, all of the professionals that worked with Carrie and Richard recommended further involvement and participation before discontinuing such services. Furthermore, the position of the social workers from the Department involved in the case, as well as the guardian ad litem for Tamora and Kristel, was that custody of the children could not be returned to Carrie within a reasonable period of time.
 {¶ 25} On the other hand, Tamora and Kristel made significant improvements while in the care of the foster parents. When the Department first gained temporary custody of Tamora and Kristel, the children were dirty, with lice, rotten teeth, severe speech problems, and learning deficiencies. Tamora and Kristel have resided with the same foster parents since being placed in foster care in June, 2001. The foster parents are interested in adopting Tamora and Kristel and the foster parents have provided the children with love and care that has allowed them to thrive. Tamora and Kristel have also expressed love and affection for the foster parents. The foster parents have addressed the concerns of the children by having Tamora's hearing evaluated and through speech therapy and play therapy for Tamora and Kristel. The foster parents have worked with the children educationally to help them advance. Both Tamora and Kristel attend school and have progressed socially. Tamora and Kristel show love and affection for their foster parents, as well as their biological parent(s).
 {¶ 26} The trial court did not ignore the fact that the children love their mother and have a bond with her. However, the trial court also took into consideration that while Carrie did visit Tamora and Kristel in accordance with her visitation plan, Carrie also missed several visitations, resulting in a temporary suspension of her visits at one location, and did not telephone the children between visits in over approximately one year. While Carrie appeared to substantially comply with her case plan, she failed to incorporate the skills she apparently learned into her daily life. Carrie failed to make the Department aware of her plan to prevent the conditions which led to the initial placement of the children with the Department. In addition, Carrie failed to show that she was more stable as a parental figure, often getting overwhelmed with her own personal issues that several times interfered with her ability to focus on the goals of the case plan.
 {¶ 27} The trial court took into consideration the best interests of Tamora and Kristel in determining that they were entitled, pursuant to R.C. 2151.414(D)(4), to a legally secure and safe placement and that such security and safety would not exist with Carrie. The best interests of Tamora and Kristel include not having to linger in foster care awaiting their mother to become a responsible parent. The trial court found, in its journal entries dated July 16, 2002, September 24, 2002, January 31, 2002, and June 5, 2003 that the Department had continued to use reasonable efforts to effectuate the case plan goals and progress towards reunification of Tamora and Kristel with Carrie. Since it could not be determined from the testimony of the many professionals involved in this case when Carrie would be competent as a parent to provide security and safety for her children, the trial court determined that the law did not require Tamora and Kristel to wait for an undetermined amount of time for such to occur.
 {¶ 28} Based on the foregoing analysis of the evidence presented in the record, we conclude that the decision of the trial court to terminate the parental rights of Carrie with regard to Tamora and Kristel and grant permanent custody of the children to the Department is supported by clear and convincing evidence. The record supports the determination that Tamora and Kristel cannot be placed with Carrie within a reasonable time and that permanent commitment with the Department is in the best interests of the children. Accordingly, Carrie's assignment of error is overruled.
 {¶ 29} Carl also appeals the trial court's judgment terminating his parental rights of Tamora and granting permanent custody of Tamora to the Department. Carl asserts the following eight assignments of error.
The court erred and abused its discretion by finding that verylittle was expected of Mr. Call in completing the case plangoals.
 The court erred and abused its discretion by finding that Mr.Call failed to involve himself in the within proceedings prior toreceiving official notice of the 2002 Motion for PermanentCustody.
 The court erred and abused its discretion by finding that Mr.Call failed to present evidence that the alleged temper problemshad been addressed.
 The court erred and abused its discretion by finding that Mr.Call declined additional visitation.
 The court erred and abused its discretion by basing itsdecision to terminate Mr. Call's parental rights on Mr. Call'smanner of dress and court room demeanor.
 The court erred and abused its discretion by basing itsdecision to terminate Mr. Call's parental rights on Mr. Call'schoice not to testify.
 The court erred and abused its discretion by finding that Mr.Call and his daughter share no bond and are essentiallystrangers.
 Section 2151.414(B)(1) of the Ohio Revised Code isunconstitutional, as same violates a parent's substantive dueprocess rights as granted by the Ohio Constitution and theUnited States Constitution.
 {¶ 30} We elect to address Carl's eighth assignment of error first, in which he asserts that R.C. 2151.414(B)(1) is unconstitutional because it violates his substantive due process rights. While we have some concern as to whether this claim was preserved by the manner in which Carl "raised" the issue in his closing argument in the trial court, by indirectly challenging the statute and arguing mainly that the statute was unconstitutional as applied to his situation, we have chosen to briefly address the assignment of error on its merits.
 {¶ 31} The constitutionality of R.C. 2151.414(B)(1)(d) was recently reviewed by the Fourth District Court of Appeals in Inre Workman, 4th Dist. No. 02CA574, 2003-Ohio-2220, 2003 WL 2012574. The court stated:
We do not believe that R.C. 2151.414(B)(1)(d) deprives aparent of fundamentally fair procedures. Prior to instituting apermanent custody proceeding under R.C. 2151.414(B)(1)(d), theparent has twelve months to demonstrate that the parent is able,suitable, or fit to care for the child. Thus, the parent is notdeprived of the ability to be reunified with the child or todemonstrate the parent's ability, suitability, or fitness to carefor the child.
 Workman, 2003-Ohio-2220, at ¶ 40. Likewise, the Tenth District Court of Appeals refused to find Ohio's statutory scheme for determining issues of permanent custody unconstitutional. Inre Thompson, 10th Dist. Nos. 02AP-557, and 02AP-558, 2003-Ohio-580, 2003 WL 257413. The court stated that it had "specifically rejected similar arguments in Thompson I," wherein that court stated:
 * * * it is apparent that the legislature in Ohio has madethe best interest of the child the touchstone of all proceedingsaddressing a permanent commitment to custody. The legislature hasalso recognized, however, that when the state seeks to terminateparental custody, parents are entitled to strict due processguarantees under the Fourteenth Amendment to the United StatesConstitution, including a hearing upon adequate notice,assistance of counsel, and (under most circumstances) the rightto be present at the hearing itself. Ohio has accordinglyincorporated appropriate due process requirements in the statutesand rules governing juvenile adjudications and dispositions,which are reflected in the extensive and rather intricatestatutory framework expressed in R.C. 2151.413 and 2151.414. Thestatutes appropriately reflect the need to balance theextraordinarily significant rights and interests: parents' rightsand interest in the custody, care, nurturing, and rearing oftheir own children, and the state's parens patriae interest inproviding for the security and welfare of children under itsjurisdiction, in those unfortunate instances where thorough andimpartial proceedings have determined that the parents are nolonger in the best position to do so.
 In re Thompson, 2003-Ohio-580, at ¶ 23, quoting In reThompson (Apr. 26, 2001), 10th Dist. No. 00AP-1358, 2003 WL 424044, *6.
 {¶ 32} We agree with the conclusions of the Fourth and Tenth Districts and conclude that R.C. 2151.414(B)(1)(d) does not deprive a parent of due process rights. We also conclude that Carl's substantive due process rights were protected during the proceedings for permanent custody in this case. Accordingly, based on the foregoing reasons, we overrule Carl's eighth assignment of error.
 {¶ 33} In the remainder of his assignments of error, Carl asserts that the trial court abused its discretion by making certain findings with regard to Carl in its September 19, 2003 judgment entry granting permanent custody of Tamora to the Department and terminating Carl's parental rights. The majority of Carl's assignments of error do not assert that the trial court failed to make the necessary findings under R.C. 2151.414(B) or (D), but rather that the trial court made extraneous findings in its judgment entry that were improper. In the interest of clarity and logic, the first through seventh assignments of error will be addressed together.
 {¶ 34} As explained above, the trial court is required to support its finding to grant permanent custody of a child to an agency by clear and convincing evidence. In this case, it is undisputed that Tamora was in the custody of the Department for twelve months of a consecutive twenty-two month period. This finding is also supported in the record by clear and convincing evidence. Therefore, we focus our discussion on whether the trial court supported its finding by clear and convincing evidence that it was in the best interest of Tamora that Carl's parental rights be terminated and permanent custody of Tamora be granted to the Department.
 {¶ 35} The focus of the trial court in determining whether to grant the Department's motion for permanent custody is the best interest of the child(ren). "In the first prong of the test, and pursuant to R.C. 2151.141(B) through (D), the court is to consider the best interest of the child and is not to consider the effect the custody decision will have on the parent." In reWise (1994), 96 Ohio App.3d 619, 624, 645 N.E.2d 812. "In evaluating the second prong of the termination test, R.C.2151.414(E) provides: `In determining * * * whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence.'" Id. at 626.
 {¶ 36} While preparation of a case plan is required by R.C.2151.412(A) and the progress of the parents is measured in part by their completion of case plan goals, the case plan is not the only measure by which a court determines whether to grant a motion for permanent custody. Substantial compliance with a case plan, without more, does not entitle a parent to custody. In theMatter McKenzie, (Oct. 18, 1995), 9th Dist. No. 95CA0015, unreported, 1995 WL 608285, *4, citing In re Watkins and Harrisv. Harris (Aug. 30, 1995), 9th Dist. No. 17068, unreported, 1995 WL 513118, *9. The main issue considered by the courts is "not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal." McKenzie, 1995 WL 608285, at *4. Since the trial court is required to assess the best interest of the child when determining whether to grant a motion for permanent custody, it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.
 {¶ 37} In this case, the trial court did not abuse its discretion by finding that although Carl completed the goals of his case plan, he had not shown the court that he had remedied the condition of his lack of parenting skills or lack of knowledge of a parental role. While Carl had few case plan goals to complete, the trial court was required to consider evidence beyond Carl's completion of these goals in determining the best interest of Tamora.
 {¶ 38} R.C. 2151.414(D)(1)-(5) sets forth the nonexhaustive list of relevant factors the court must consider in determining the best interest of a child at a hearing for permanent custody. The record shows that the trial court appropriately considered these factors, among others, including the parents' progress regarding the case plan goals, in making the determination that it was in Tamora's best interest to grant the Department's motion for permanent custody.
 {¶ 39} In making its findings, the trial court clearly considered R.C. 2151.414(D)(1), which provides the trial court shall consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child[.]" In its judgment entry, the trial court found that although Carl had a biological connection to Tamora, there was little parental attachment between them. The testimony of Melissa Kern, the foster mother of Tamora, indicated that Tamora did not have much of a bond with Carl and was not always comfortable around Carl. In addition, the guardian ad litem and unit support worker for the Department testified that Carl and Tamora, from their observations, did not appear to have a bond. The lack of bonding between Carl and Tamora may have been related to Carl's absence for the first six years of Tamora's life.
 {¶ 40} The trial court also properly considered the testimony of Ann Biddlestone, Tamora's therapist, regarding Tamora's relationship with Carl. Pursuant to R.C. 2151.414(D)(2), the trial court can consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child[.]" According to Ann Biddlestone, Tamora clearly expressed that she enjoys playing games with Carl but does not want to go live with him. Tr. 165. Ann Biddlestone testified that she believed Tamora had a fear of the unknown. Id. The guardian ad litem for Tamora also recommended that custody of Tamora be granted to the Department.
 {¶ 41} In the home study conducted of Carl on November 26, 2002, the home study specialist concluded that Carl did not accept any responsibility for his lack of relationship with Tamora. The specialist also felt that Tamora's transition into Carl's home would be difficult since Carl had only been visiting Tamora once or twice a month during the period of time he was made a part of the case plan. Carl also showed limited knowledge of Tamora's special needs.
 {¶ 42} Furthermore, the trial court considered the relationship Tamora had with her sister, Kristel, and her foster parents, in determining Tamora's best interest. The record revealed that Tamora expressed love and affection for both of her foster parents and was comfortable and secure in her placement with the foster parents. The record also shows that Tamora had made many improvements in her social and academic development since being in the care of her foster parents. More importantly, the trial court considered the bond between Tamora and Kristel, noting that:
The children are very bonded with each other. They have gonethrough abuse, foster care, etc. together. They play together,wait for each other, "mother" each other, look out for eachother, they speak for each other and have their own language.When stressed, they were found in one bed together and holdingeach other. Because of changes preceding this hearing they haveresumed this practice.
September 19, 2003 Judgment Entry, p. 11. The trial court considered the lack of concern Carl showed for the strong attachment Tamora had with her sister, Kristel.
Mr. Call's main concern seems to be that his pride wasoffended because his child might be placed in foster care. He didnot speak to love, attachment or affection for his daughter ashis reasons to seek custody of her. Mr. Call was likewiseinsensitive to the issue of the bond between his daughter and herhalf sister. According to the report of the Guardian Ad Litem,Mr. Call `doesn't see the big deal if Tamora were to be separatedfrom her sister.' He also said he doesn't care about whathappened to Kristel because she `isn't his kid.' [CASA reportdated 08/19/2003.] These comments are of concern because, evenafter his contact with Tamora, Mr. Call fails to appreciate whatis important to Tamora and the significance of the role Kristelhas played in her life.
September 19, 2003 Judgment Entry, p. 5.
 {¶ 43} The trial court also properly considered "[t]he child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(4). The court found that a secure permanent placement for Tamora could not be established for either parent at the time of the hearing for permanent custody. Not one professional involved in the case opined that Tamora should be placed in the custody of either parent. The trial court further found that Tamora could receive a secure permanent placement with the foster parents, who were willing to adopt both Tamora and Kristel. Since the testimony at the hearing did not reveal when a secure placement with either parent could be expected, the trial court determined that Tamora should not linger in foster case awaiting something from her parents that might not happen.
 {¶ 44} Since the trial court can consider all relevant evidence in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the trial court did not abuse its discretion by considering Carl's decision not to testify and refute the testimony at the hearing. Because Carl chose not to testify at the hearing for permanent custody, the trial court properly considered the testimony of other witnesses with regard to Carl and made the findings based in part on the fact that Carl failed to present evidence that he had tried to involve himself in the proceedings prior to receiving official notice of the motion for permanent custody, that his alleged temper problems had been addressed, that he declined additional visitation with Tamora, and that he and Tamora did not share a bond with each other. These unrefuted findings are supported by clear and convincing evidence in the record.
 {¶ 45} All of the aforementioned evidence was relevant to the central issue of the hearing, which was whether it was in the best interest of Tamora for the court to terminate Carl's parental rights and grant the Department permanent custody. The trial court properly considered all of the testimony presented at the hearing before making its findings. While the trial court noted its observations of Carl's dress and demeanor at the hearing on the motion for permanent custody, it is not apparent from the September 19, 2003 judgment entry that the trial court gave inappropriate weight to any particular findings over others. In fact, the trial court stated in its judgment entry that "[t]here is plenty of blame to go around as to why this case came to Court after approximately two years and on this footing, but that is not or should not be the focus, at this point in time." September 19, 2003 Judgment Entry, p. 13.
 {¶ 46} As the judgment of the trial court terminating Carl's parental rights and granting permanent custody of Tamora to the Department is supported by clear and convincing evidence, we overrule Carl's first through seventh assignments of error and affirm the judgment of the Common Pleas Court of Wyandot County, Juvenile Division.
Judgments affirmed.
Haw, P.J., and Cupp, J., concur.