OPINION
{¶ 1} Appellant, Darnetta Abram ("Ms. Abram"), appeals from the February 5, 2004 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which terminated Ms. Abram's parental rights with respect to three of her seven children,[1] Damion Carter, also known as Jajuan Damion Carter (date of birth May 19, 1996), Dontevis Abram (date of birth October 17, 1997), Devon Abram (date of birth August 3, 1999), and granted permanent custody of these children to appellee, Franklin County Children Services ("FCCS"), for purposes of adoption. Appellant, Dushian Thomas ("Mr. Thomas"), also appeals from the February 5, 2004 judgment with respect to the termination of Mr. Thomas's parental rights and the granting of permanent custody of his child, Dontevis, to FCCS. For the reasons stated below, we affirm the judgment of the trial court.
 {¶ 2} On April 17, 2000, FCCS filed a complaint alleging that Dontevis (then aged two years) and Devon (then aged eight months) were abused, neglected, and dependent children. FCCS also filed a separate complaint alleging that Damion (then aged three years) was an abused, neglected, and dependent child. On the same day that these complaints were filed, the trial court issued emergency care orders that authorized FCCS to temporarily care for Dontevis, Devon, and Damion. The trial court appointed the Franklin County Public Defender as the children's guardian ad litem. On July 26, 2000, the trial court found the children dependent as defined in R.C. 2151.04(C), and ordered FCCS's temporary custody of the children to continue.
 {¶ 3} On August 28, 2000, the trial court approved and adopted a case plan. The case plan required, inter alia, that Ms. Abram maintain stable housing, including adequate maintenance and cleanliness; maintain employment; submit to drug assessment and appropriate treatment, including random drug screens; and complete parenting classes.
 {¶ 4} On October 23, 2001, the trial court extended the temporary custody to FCCS. Subsequently, on February 21, 2002, FCCS moved for permanent custody of Dontevis, Devon, and Damion pursuant to R.C. 2151.413.[2] A trial was held on this matter on June 4 and December 9, 2003.
 {¶ 5} In its decision, the trial court found that "there is clear and convincing evidence that the award of permanent custody of the minor children, Damion Carter, Dontevis Abram and Devan [sic] Abram to FCCS is in the minor children's best interest." (Feb. 5, 2004, Decision and Journal Entry, at 4.) The trial court terminated FCCS's temporary custody, committed the children to the permanent custody of FCCS for purposes of adoption, and terminated the parental rights of the mother, Ms. Abram, and the alleged fathers, Kenan Brown, Jarvis Carter, and Mr. Thomas. Appellants separately appealed from this judgment of the trial court.
 {¶ 6} This court sua sponte consolidated these three appeals. Furthermore, this court granted appellants' motion to supplement the record with additional findings of fact of the trial court. Ms. Abram has raised the following assignment of error in her appeal to this court:
The court erred when it determined that the children could not or should not be returned to their mother in a reasonable period of time. this finding is against the manifest weight of the evidence.
 {¶ 7} Mr. Thomas has assigned the following assignment of error:
The decision and entry of the trial court is clearly is adverse [sic] to the weight of the evidence, appendix 1 and 2. The weight of the evidence does not support the conclusion that Dontevis could not be placed with the mother within a reasonable period of time. The evidence did not support the conclusion that the mother was addicted to drugs.
 {¶ 8} Ms. Abram's assignment of error asserts that the trial court's judgment is against the manifest weight of the evidence because the court erred when it determined that the children could not or should not be returned to the mother in a reasonable period of time. Mr. Thomas's assignment of error contends that the judgment of the trial court is against the manifest weight of the evidence because the weight of the evidence does not support the conclusions that Dontevis could not be placed with the mother in a reasonable time and that the mother was addicted to drugs. Because the appellants, by their assignments of error, both argue that the trial court's judgment is against the manifest weight of the evidence, we will address the respective assignments of error together.
 {¶ 9} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, syllabus. This standard applies to the review of permanent custody judgments. See, e.g., In reThompson, Franklin App. No. 02AP-557, 2003-Ohio-580, ¶ 48 ("Thompson II"), citing In re Brofford (1992),83 Ohio App.3d 869,876-877. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 10} "It is well recognized that the right to raise a child is an `essential' and `basic' civil right." In re Hayes (1997),79 Ohio St.3d 46, 48, citing In re Murray (1990),52 Ohio St.3d 155. Also, "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" In reHayes, at 48, quoting In re Smith (1991), 77 Ohio App.3d 1.
 {¶ 11} Pursuant to R.C. 2151.414(B)(1), a court may grant permanent custody of a child to a state agency if the court determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
Regarding the issue of whether a child can or should be placed with either parent within a reasonable time in the context of this statutory scheme, this court, in Thompson II, at ¶ 49, stated as follows:
Pursuant to R.C. 2151.414(B)(1)(d), when a child has been in the custody of FCCS for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, a trial court need not engage in an analysis of whether the child can or should be placed with either parent within a reasonable time. * * * Instead, the only consideration in such a case is the best interests of the child, which is determined by consideration of the factors set forth in R.C. 2151.414(D) in light of the facts of the particular case.
(Citation omitted.)
 {¶ 12} We note that Ms. Abram has argued that "[i]f 2151.414(B) allows the grant of custody to the agency without a determination of whether the child could not or should not be returned to the parents in a reasonable period of time, it is unconstitutional." (Ms. Abram's appellate brief, at 8.) This court has already addressed the constitutionality of Ohio's statutory scheme for determining issues of permanent custody. SeeIn re Thompson (Apr. 26, 2001), Franklin App. No. 00AP-1358 ("Thompson I"). In Thompson I, this court stated as follows:
We agree with appellant that it is apparent that the legislature in Ohio has made the best interest of the child the touchstone of all proceedings addressing a permanent commitment to custody. The legislature has also recognized, however, that when the state seeks to terminate parental custody, parents are entitled to strict due process guarantees under theFourteenth Amendment to the United States Constitution, including a hearing upon adequate notice, assistance of counsel, and (under most circumstances) the right to be present at the hearing itself. Ohio has accordingly incorporated appropriate due process requirements in the statutes and rules governing juvenile adjudications and dispositions, which are reflected in the extensive and rather intricate statutory framework expressed in R.C. 2151.413 and 2151.414. The statutes appropriately reflect the need to balance the extraordinary significant rights and interests: parents' rights and interest in the custody, care, nurturing, and rearing of their own children, and the state'sparens patriae interest in providing for the security and welfare of children under its jurisdiction, in those unfortunate instances where thorough and impartial proceedings have determined that the parents are no longer in the best position to do so.
We do not find that the balance struck by the legislature in achieving this reconciliation between occasionally incompatible goals has been shown to be constitutionally offensive. * * *
 {¶ 13} With respect to the specific argument that R.C.2151.414(B)(1)(d) is unconstitutional, the Fourth District Court of Appeals has stated:
We do not believe that R.C. 2151.414(B)(1)(d) deprives a parent of fundamentally fair procedures. Prior to instituting a permanent custody proceeding under R.C. 2151.414(B)(1)(d), the parent has twelve months to demonstrate that the parent is able, suitable, or fit to care for the child. Thus, the parent is not deprived of the ability to be reunified with the child or to demonstrate the parent's ability, suitability, or fitness to care for the child.
In re Workman, Vinton App. No. 02CA574, 2003-Ohio-2220, at ¶ 40. See, also, In re Gomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723 (rejecting argument that R.C. 2151.414(B)(1)(d) is unconstitutional). Therefore, we find Ms. Abram's constitutionality argument to be without merit.
 {¶ 14} The requirements of R.C. 2151.414(B)(1) must be established by clear and convincing evidence. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." In re Estate of Haynes (1986), 25 Ohio St.3d 101,104.
 {¶ 15} The trial court found that clear and convincing evidence established that the children had been in the temporary custody of a public children services agency under one or more separate orders for 12 or more months of a consecutive 22-month period. No party contests this finding. Consequently, because R.C. 2151.414(B)(1)(d) was established, the next issue is whether the trial court's finding that clear and convincing evidence established that the awarding of permanent custody of the children to FCCS was in the children's best interest was supported by competent, credible evidence.
 {¶ 16} When determining the best interest of a child at a permanent custody hearing, the trial court shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(D).
 {¶ 17} There was sufficient clear and convincing evidence before the trial court for it to determine that permanent custody is in the children's best interest.
 {¶ 18} On April 14, 2000, the police removed Dontevis, Damion, and Devon from Ms. Abram's care. The children were removed from Ms. Abram's home when her caseworker went to her home and found the children home alone and the home in an unacceptable condition.[3]
 {¶ 19} Ms. Abram testified that after the children were removed in April 2000, she admitted that she had a drug problem that contributed to her inability to care for the children. She testified that the reason the children were neglected was because of stress that arose from the lack of help from others. Moreover, when she was asked at trial "how did your drug use have an impact on your ability to care for all of these seven children," Ms. Abram responded, "Because I would get high and I would just sit around." (June 4, 2003, Tr. 68.) Shortly after the children were removed, Ms. Abram was receiving drug screens by a caseworker, but according to Ms. Abram, she did not complete these drug screens because she "was still getting high." Id. at 69-70. Ms. Abram testified that the first drug screen she completed for FCCS was positive for marijuana. After a drug and alcohol assessment, Ms. Abram was assigned to drug and alcohol classes and she enrolled at Project Linden. At Project Linden, Ms. Abram tested positive for marijuana and also had attendance problems. Ms. Abram failed to complete the program at Project Linden.
 {¶ 20} Subsequent to her termination from the program at Project Linden, Ms. Abram enrolled at the Neighborhood House in October 2002. Ms. Abram testified that she continued to use marijuana prior to enrolling at Neighborhood House and that the last time she used marijuana was October 5, 2002. At trial, Ms. Abram admitted that she subsequently tested positive for marijuana; however, she explained that she did not use marijuana after that date, but "was around marijuana smoke." (Dec. 9, 2003, Tr. 144.) Ms. Abram completed a three-month program at Neighborhood House. After completing the three-month program, Ms. Abram continued to be given drug screens to complete. However, she did not complete all of the screens.
 {¶ 21} Rashita Evans, a drug and alcohol counselor at the Neighborhood House, testified at trial. Ms. Evans testified that drug testing is part of the program at the Neighborhood House. Ms. Evans also testified that Ms. Abram completed drug screens at the Neighborhood House, tested positive for marijuana in December of 2002, and successfully completed the program. According to Ms. Evans, clients at the Neighborhood House are required to attend AA meetings during their course of treatment and are encouraged to participate in AA as part of an aftercare plan. At trial, Ms. Abram was asked, "And do you remember that part of your aftercare plan was that you were to attend regular AA meetings," Ms. Abram responded, "Yes." (Dec. 9, 2003, Tr. 72.) Ms. Abram did not attend AA meetings subsequent to her treatment program. Furthermore, according to Jessica Adams-Gierhart, who was a caseworker that was assigned to this case, Ms. Abram completed some, but not all of the drug screens that were given to her.
 {¶ 22} Both appellants have raised the frequency of the drug screens as an issue in this case. Testimony at trial indicated that Ms. Abram's caseworker requested at least two to three drug screens per month, and possibly five per week for a period of two weeks, but that Ms. Abram completed only approximately ten percent of the drug screens. Ms. Abram has argued in this appeal that the drug testing in this case was excessive, and that her refusal to submit to all the drug tests should not be a basis for granting permanent custody to FCCS.[4] Ms. Abram specifically argues that "any testing required by the agency that is more than once a month is presumptively unreasonable and a violation of the 4th Amendment." (Ms. Abram's appellate brief, at 11.) This court has previously rejected this argument. See In re Quartez Davis (Aug. 3, 2004), Franklin App. No. 04AP-184, at ¶ 19 ("A plain reading of R.C. 2151.3514[B] supports the interpretation that the period contained therein is a required minimum only and does not restrict a trial court's authority to order more than one test per month for a period of 12 consecutive months.") Under the circumstances of this case, we do not find the frequency of the drug screen requests to be unreasonable. Thus, appellants' arguments with respect to the frequency of the drug testing and the trial court's consideration of the testimony regarding her non-completion of many of the drug screens are without merit.
 {¶ 23} Regarding supervised visits, Ms. Adams-Gierhart testified that "[t]here were some times when the visits went very well and sometimes when they didn't go very well." (Dec. 9, 2003, Tr. 90.) More specifically, Ms. Adams-Gierhart testified that "there were times when the visits went very well and they were hugging her and there were times when they were telling her that they hated her." Id. at 102. According to Ms. Adams-Gierhart, sometimes at the visits Ms. Abram was "loud and yelling" and threatening to spank the children. Id at 90. Ms. Adams-Gierhart also testified that the children are bonded to each other.
 {¶ 24} Vanise Dunn, an FCCS caseworker assigned to this case, testified that Ms. Abram completed parenting classes, which was a component of the case plan. Ms. Dunn testified that she observed the children with the foster parents and considered the children's interactions with the foster parents as "very good. They refer to the foster parents as mom and dad." Id. at 124. Ms. Dunn testified that the children refer to Ms. Abram as "old mom." Id. at 131. According to Ms. Dunn, the foster parents are "considering" adopting the children. Id. at 124.
 {¶ 25} Ms. Abram testified to her recent employment history. Ms. Abram was not employed in 1999, 2000, or 2002. In 2001, Ms. Abram worked for Marzetti for one and one-half months. She worked at The Ohio State University through a temporary service agency from January to May 2003. She was fired from that employment because she got into a verbal altercation with her supervisor. Ms. Abram began working for Masterclean in August 2003. She was fired from Masterclean because she got into a verbal altercation with her supervisor. Three weeks prior to the December 9, 2003 trial date, she began working at Petsmart. Ms. Abram testified that during the periods she was not employed, her source of income came from braiding hair. According to Ms. Abram, she earned $200 to $400 per month braiding hair, and she had been braiding hair for about 15 years. (Dec. 9, 2003, Tr. 48.)
 {¶ 26} The guardian ad litem for the children at the time of trial, Susan Laughlin-Schopis, testified that Devon was too young to express his wishes regarding his placement. Ms. Laughlin-Schopis found Dontevis to be sufficiently mature to express his wishes and that Dontevis has indicated that he does not want to return to the care of Ms. Abram. Ms. Laughlin-Schopis also found Damion to be sufficiently mature to express his wishes and that Damion has indicated a wish to be adopted. Ms. Laughlin-Schopis recommended that the trial court grant permanent custody of all three children to FCCS.
 {¶ 27} Ms. Abram argues that there is a bond between her and the children and that she has substantially completed her case plan. Although there may be some evidence to indicate that there is a bond between her and the children and that Ms. Abram has taken steps to complete her case plan, this does not preclude this court from finding that competent, credible evidence supported the trial court's determination that permanent custody is in the children's best interest. Therefore, these arguments are without merit in this appeal.
 {¶ 28} The evidence at trial supports the trial court's finding that the fathers have abandoned the children. Mr. Thomas, the father of Dontevis, participated in the proceedings below and testified that he had been in prison since January 10, 1999, serving a five year and four month sentence for aggravated assault and possession of crack cocaine. His projected release date was May 5, 2004. Ms. Abram testified that Mr. Thomas had not visited Dontevis regularly prior to his incarceration. Damion's father, Jarvis Carter, did not participate in the proceedings below. Ms. Abram testified that since Damion has been in foster care, Mr. Carter has visited him twice and that Mr. Carter has never provided financial support for Damion. Devon's father, Kenan Brown, also did not participate in the proceedings below. According to Ms. Abram, Mr. Brown has never seen Devon.
 {¶ 29} Upon our consideration of all the evidence in this case, including the evidence discussed above, we conclude that the trial court's determination that FCCS had established, by clear and convincing evidence, that permanent custody of the three minor children to FCCS is in the children's best interest, was supported by competent, credible evidence.
 {¶ 30} Based on the foregoing, we conclude that the judgment of the trial court terminating the parental rights of the mother, Darnetta Abram, and the alleged fathers, Kenan Brown, Jarvis Carter, and Dushian Thomas, and granting permanent custody of Damion Carter, Dontevis Abram, and Devon Abram, to FCCS for purposes of adoption was not against the manifest weight of the evidence. Accordingly, we overrule both appellants' assignments of error.
 {¶ 31} For the foregoing reasons, Ms. Abram's assignment of error and Mr. Thomas's assignment of error are both overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.
Judgment affirmed.
Brown and Sadler, JJ., concur.
[1] The four children that are not involved in this appeal reside with their father.
[2] R.C. 2151.413(D)(1) provides that an agency which has temporary custody of a child shall move for permanent custody if the "child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999[.]"
[3] The complaints filed in this case alleged that when the caseworker arrived at the home on April 14, 2000, the children were "filthy, and the home was dirty and deplorable. Baby was on the couch, that was urine soak [sic] without a diaper sucking on an empty bottle. Mother arrived home 20 minutes later and stated that someone was supposed to watch the children." (Apr. 17, 2000 complaints.)
In February 2000, one of Ms. Abram's children, who is not subject to this appeal, had burns on his legs, knees, and wrists, from an iron. Ms. Abram testified that she discovered the burns on her child a week later, and that the child told her he had been ironing. (June 4, 2003, Tr. 65.) Also, Dontevis had bite marks on his back, where one of his brothers apparently bit him. Id. at 66-67.
[4] Mr. Thomas has argued that the drug testing of Ms. Abram violated R.C. 2151.3514.